539 A.2d 1151

**Connie I. MORRIS, Personal Representative of the Estate of Irene May Ragland**

v.

**Ann G. WILSON et al.**

**No. 1085, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

April 12, 1988.

Certiorari Granted June 30, 1988.

664

Daniel F. Goldstein (Elizabeth M. Kameen and Brown and Goldstein, Baltimore, William Schildt and Strite, Schildt & Varner, Hagerstown, on the brief), for appellant.

Deborah A. Johnston, Landover, for appellee Myrna Binkley.

Lydia B. Duff, Staff Atty. (J. Joseph Curran, Jr., Atty. Gen., and Roberta M. Ward, Asst. Atty. Gen., Baltimore, on the brief), for appellee, Ann G. Wilson.

Argued before WILNER, ALPERT and KARWACKI, JJ.

ALPERT, Judge.

In March of 1982, Irene Ragland entered a program at the Western Maryland Adult Day Care Treatment Center (hereinafter "the Center"). She was 67 years old at the time and lived with her niece, Connie Morris. Apparently, Mrs. Ragland entered the program because of a combination of factors—her family was hesitant to leave her home alone all day, and Mrs. Ragland needed physical therapy, psychiatric counseling, and general physical care that could be provided by the Center.

The Center was adjacent to the Washington County Health Department (hereinafter "the Health Department") which provided, mental health services to clients of the Center who were brought to the department by the Center's staff members. Mrs. Ragland was one of the clients who received mental health services.

On May 6, 1982, Mrs. Ragland was wheeled in a wheelchair from the Center to the Health Department for coun-

seling. Mary Shain, the aide who wheeled Mrs. Ragland to the Health Department, left Mrs. Ragland there and asked the second floor receptionist, Carol Hastings, to call her when Mrs. Ragland was ready to be brought back to the Center. Some time later, Ms. Shain was contacted and informed that Mrs. Ragland was ready. After a delay of several minutes, Ms. Shain left the Center and went to get Mrs. Ragland.

At the trial, Ms. Shain testified that when she went outside she observed Mrs. Ragland sitting unattended in her wheelchair outside the Health Department. She said that she started to run to her, looked down and when she looked up, Mrs. Ragland's chair had rolled down an access ramp for the handicapped and Mrs. Ragland had slid forward onto the pedals of the wheelchair.[1]

In a deposition prior to her death, Mrs. Ragland said she waited 15 or 20 minutes for someone to get her. When no one did, she wheeled herself to the elevator, took the elevator down to the first floor and waited by the door. She said that the receptionist at the door offered to take her over to the Center. According to Mrs. Ragland, the receptionist opened the door and pushed the wheelchair outside. The receptionist then allegedly ran back inside to answer a phone call, leaving Mrs. Ragland unattended. Appellee Ann Wilson has identified herself as the first floor receptionist at the Health Department at the time of the accident. Ms. Wilson contends, however, that Mrs. Ragland had merely asked her to open the doors for her so that she could sit outside and wait for someone to return her to the Center. It was undisputed that the wheelchair brake was not on and that the chair ultimately rolled forward down a slight incline.

Mrs. Ragland filed suit in the Circuit Court for Washington County. She named as defendants Myrna Binkley, who was the Director of the Western Maryland Adult Day Care

---

1. The nature of Mrs. Ragland's fall from the chair and the extent of her injuries were disputed at the trial.

Treatment Center; Mary Shain who transported her to the Health Department and who was responsible for bringing her back to the Center; and Ann G. Wilson, the Health Department receptionist who allegedly pushed Mrs. Ragland outside at her request. Mrs. Ragland died prior to trial of causes unrelated to the occurrence, and her niece, Connie Morris, continued the suit as the Personal Representative of Mrs. Ragland's estate.

The trial judge granted a motion for judgment on behalf of Mary Shain. The jury returned a verdict in favor of the other two defendants. Connie Morris then filed this appeal.

## I.

 Appellant claims that the trial judge erred in refusing to admit evidence of prior and subsequent hospital procedures for transporting patients to and from the Health Department. Appellees preliminarily argue that, assuming *arguendo* the evidence should have been admitted, the error was not reversible. Appellees assert, and we concur, that the evidence regarding prior and subsequent hospital procedures goes to the issue of the primary negligence of the appellees—whether, in fact, they exercised due care for Mrs. Ragland. They argue that inasmuch as the jury found that Mrs. Ragland had assumed the risk of injury and/or been contributorily negligent,[2] exclusion of evidence that goes to the primary negligence of the defendants cannot be reversible error. We agree, *see Erdman v. Johnson Brothers Radio and Television Co.*, 260 Md. 190, 271 A.2d 744 (1970), but because we shall reverse on other grounds, we will also address the admissibility of the evidence for the

---

**2.** Prior to retiring for deliberations, the jury was given a verdict sheet asking them to decide (1) whether the defendants had been negligent, and (2) whether Mrs. Ragland had assumed the risk of injury and/or been contributorily negligent. The jury found that the defendants had not been negligent and that Mrs. Ragland assumed the risk of injury and/or been contributorily negligent.

issue will probably arise on remand.[3]

The evidence offered by appellant alleged that the Center had a particular procedure for the transportation of its patients, and that the Center changed that procedure, only to reinstitute it after Mrs. Ragland's accident. For the reasons that follow, we conclude that the evidence as to the Center's prior and subsequent procedures demonstrates a pattern of conduct that makes those procedures relevant and admissible.

### A. Admissibility of Subsequent Procedures

█ Appellant sought to introduce evidence at trial that the Center changed its procedure after Mrs. Ragland's accident and required staff members to remain with patients taken to the Health Department until they completed their appointments. The trial judge refused to admit this evidence.[4]

Under the common law, when remedial measures are taken following an accident, injury, or event for the purpose of making the event less likely to recur, evidence of those remedial measures is not admissible as an admission of negligence, culpable conduct, or liability in connection with the event. Maryland ostensibly follows the common law rule. Thus, evidence of such subsequent remedial measures as repairs, changes in procedure, changes in material or personnel, and other precautionary

---

**3.** In any event, the policies adopted by the Center are not admissible against appellee Ann Wilson, who is employed by the Health Department. As she argues in her brief:

The standards of conduct reasonably expected of her as receptionist at the Health Department could not be influenced by changes in the transportation policy of the Day Care Treatment Center. Thus, neither a standard of conduct, nor a negligent deviation from such standard could be shown from evidence of the transportation policies of the Day Care Treatment Center.

**4.** The trial judge granted a motion *in limine* made by the defendants prior to trial wherein he held the evidence was inadmissible. At trial, appellant renewed her offer to introduce the evidence and the trial judge again held that it was inadmissible.

actions may not be received as admissions of negligence or culpability.

L. McLain, 5 *Maryland Practice: Maryland Evidence,* § 407.1 at 407–08 (1987) (footnotes omitted).

On appeal, appellant contends that Maryland case law permits the introduction of remedial actions taken after an accident to establish the applicable standard of care. Conversely, appellee argues that the evidence was inadmissible "to establish the existence of a dangerous condition, Defendant's knowledge or notice of the condition as well as the proper standard of care."

The first Maryland case to address the issue fully was *American Paving and Construction Co. v. Davis,* 127 Md. 477, 96 A. 623 (1916). The plaintiff in that case alleged that sparks from a steam shovel operated by the defendant ignited a fire on the roof of plaintiff's home. On appeal, the defendant claimed that the judge erred when he permitted testimony that the defendant put a wire screen over the smokestack of the shovel immediately after the fire and that the sparks were reduced considerably by the safety measure. The Court of Appeals held the evidence was clearly admissible "not only for the purpose of showing that the fire was caused by the sparks from the steam shovel, but also as tending to show negligence on the part of the defendant." *Id.* at 483, 96 A. 623. The court went on to note that although the subsequent repair measures "would not be admissible for the purpose of establishing an admission of liability by the defendant," it was admissible "as reflecting upon the question whether the defendant had exercised proper care and caution to avoid injury to the plaintiff's property." *Id.* at 483–84, 96 A. 623.

Following this line of reasoning, the United States District Court for the District of Maryland permitted the introduction of evidence that the Federal Government deepened a drainage ditch along a portion of the Suitland Parkway after an accident occurred there. *Jennings v. United States,* 207 F.Supp. 143 (D.Md.1962), *aff'd,* 318 F.2d 718 (4th Cir.1963). The plaintiff alleged that the grading of

an area adjacent to the scene of the accident caused water to collect on the roadway, which froze in the wintertime and created a hazardous condition. Citing *American Paving*, the court held the evidence of subsequent remedial measures was admissible to show "whether the defendant had exercised proper care and caution." *Id.* at 148.

The Court of Appeals reiterated this position in *Blanco v. J.C. Penney Co.*, 251 Md. 707, 248 A.2d 645 (1968). The plaintiff in *Blanco* sued for injuries suffered when she walked through a plate glass panel, apparently thinking it was an open door. The Court of Appeals held that the subsequent installation of decals on the glass panels was admissible. The court repeated that although the installation of the decals did not constitute an admission, the installation was admissible to establish whether the defendant had exercised "proper care and caution to avoid causing injuries such as those sustained by the [plaintiff]." *Id.* at 709, 248 A.2d 645.

The exception to the general rule against admissibility carved out in *American Paving* and *Blanco* has generated some confusion. One commentator noted that the *Blanco* exception, which permitted introduction of subsequent repairs to establish "that the applicable standard of care had not been met" provides for "indirect proof of causation." L. McLain, 5 *Maryland Practice: Maryland Evidence*, § 407.1 at 410. Professor McLain went on to opine that "this exception 'swallows the rule.'" *Id.*

Other cases, however, have limited somewhat the holding in *American Paving* and *Blanco*. Those cases did not change the rule that such evidence is admissible, although they did limit the usefulness of the evidence. In *Ramsey v. D.P.A. Associates*, 265 Md. 319, 289 A.2d 321 (1972), the plaintiffs sued when a four year old boy, Michael, was injured when a glass door collapsed on him. The door was framed with metal and had a push bar approximately four feet from the floor. Michael, who was only about 32″ tall at the time of the accident, pushed on the glass to open the door, and it collapsed on him. His father instituted suit on

his behalf, alleging that the owner of the premises was negligent in failing to have a push bar at the child's level. The trial judge directed a verdict in favor of the defendant in spite of evidence that the defendant installed such a push bar after the accident. The Court of Appeals found no error and held that the judge properly directed a verdict in favor of the defendant at the close of the plaintiff's case. In doing so, the court failed to refer to either *American Paving* or *Blanco.* The court said:

> The fact that the appellees placed a bar at child height across the door subsequent to the accident is, as argued by the appellees in their brief, of no more significance as evidence of negligence than if they had replaced the door with a solid walnut door. There was no evidence in this case that the landlord had any notice of any dangerous characteristics of the glass door. There was no evidence that the glass failed to measure up to some accepted standard. There was no evidence that a bar of child height was the norm or standard expected for such doors. In short, appellants presented no evidence of negligence on the part of the appellees.

*Id.* at 324, 289 A.2d 321.

*Hagan v. Washington Suburban Sanitary Commission,* 20 Md.App. 192, 314 A.2d 699 (1974), also relied upon by appellee, again involved the sufficiency of the evidence presented and not the admissibility of the subsequent policies of the defendant. In *Hagan,* the plaintiff sued when he tripped over a fire hydrant located in the middle of a sidewalk. After a jury verdict in favor of the plaintiff, the trial judge entered a judgment notwithstanding the verdict in favor of the defendant, finding, among other things, that there was no evidence of negligence on the part of the defendant. Speaking for this court, Judge Lowe held that evidence that the hydrant was moved shortly after the accident was not legally sufficient to establish the defendant's "prior knowledge that a hazard may have existed." *Id.* at 197–98, 314 A.2d 699. He noted that although the *Blanco* court held that evidence of subsequent remedial

measures was "clearly admissible ... as tending to show negligence on the part of the defendant," it also held that such evidence could not be introduced as an admission of liability. *Id.* at 198, 314 A.2d 699, citing *Blanco,* 251 Md. at 710, 248 A.2d 645. Judge Lowe went on to note that evidence of subsequent repairs "cannot give birth to a hazard where none exists, nor impart a knowledge that is otherwise absent." *Id.* The court concluded:

The phrase "to show negligence" as used in *Blanco, supra,* must be interpreted as applying to the third element of negligence listed above, *i.e., whether appellee owed a duty to the appellants to correct the condition if* it was a hazard, and *if* appellee was charged with knowledge that it was hazardous.

To permit a corrective act after the fact to imply knowledge of a dangerous condition before the fact contradicts both logic and reason. It would make such an act tantamount to an "admission of liability" which *Blanco* expressly precludes.

We need not elaborate upon the obvious, although highly important, public policy reasons requiring strictness in the admission of such evidence. Suffice to say, the reason for our hesitancy to admit such evidence freely is not that it lacks probative significance but rather that we recognize the very urgent policy against discouraging the taking of safety measures.

Evidence that the hydrant was moved after Dr. Hagan's fall was properly admitted for the two limited purposes recited by appellants, "to show who had actual control over the plug and *to show what was feasible to correct the condition prior to the accident.*" It cannot, however, now serve to fill the evidentiary void of appellee's knowledge of the existence of a latent danger prior to the accident.

*Id.* 20 Md.App. at 199, 314 A.2d 699 (some emphasis added). Thus, *Hagan* limited the purpose for which subsequent remedial measures can be introduced. The subsequent measures are relevant only to show "whether [the defend-

ant] owed a duty to the [plaintiff] to correct the condition" and to show "what was feasible to correct the condition prior to the accident." *Id.* The plaintiff must otherwise establish that there was a hazard and that the defendant had knowledge of that hazard.

The latest pronouncement on the issue was in *University Nursing Home v. R.B. Brown & Associates, Inc.,* 67 Md. App. 48, 506 A.2d 268 (1986). In that case, the plaintiff/insured alleged that the defendant, its insurance agent, had a contractual duty to provide it with business interruption insurance that was adequate to cover all income which it could potentially lose as a result of a fire or other disaster. In furtherance of this argument, the plaintiff sought to introduce evidence that after it suffered the casualty, the defendant/agent wrote to the insurance company seeking a quotation for an increase in its coverage for the insured. Citing *Hagan,* 20 Md.App. 192, 314 A.2d 699, the court held that the judge should consider on remand whether the evidence was probative of the agent's duty to provide the required coverage. 67 Md.App. at 70, 506 A.2d 268.

In the case at bar, appellee Binkley, the director of the Center, argues that appellant wants to introduce the subsequent change to establish: the existence of a dangerous condition; appellee's knowledge of the danger; and the proper standard of care. She also argues that *Ramsey* and *Hagan* hold that "evidence of a subsequent change in procedure is not admissible unless there is some other evidence to establish the existence of a dangerous condition and [appellee's] knowledge of the same." This statement is not quite accurate. Although *Ramsey* and *Hagan* hold that evidence of subsequent remedial measures is not legally sufficient to establish all the elements necessary to prove negligence, *i.e.,* the danger, the defendant's knowledge of that danger, as well as the standard of care, those cases do hold that the subsequent change is admissible to establish the duty of the defendant. There is no support for appellee's argument that the evidence is not admissible unless

and until the plaintiff establishes the dangerous condition and the defendant's knowledge of that danger.

## B. Admissibility of Prior Procedures

■ At trial, appellant sought to introduce evidence that until late 1980 or early 1981 the Center's policy was to have a staff member remain with patients who were taken to the Health Department until they completed their appointments. At the time of Mrs. Ragland's accident, however, the Center's policy was to leave the patients at the Health Department and ask a staff member of the Health Department to call the Center when the patient had completed his appointment. The Center is immediately adjacent to the Health Department, and there was testimony that it took only minutes to get from one building to the other.

Both parties concede that there is no Maryland case law concerning the admissibility of prior policies or practices, standing alone, to show a breach of the applicable standard of care. Our research similarly fails to uncover any common law rule permitting or prohibiting the admission of such prior policies. The rationale often used to prevent introduction of *subsequent* changes in policies, *i.e.*, that it would discourage the taking of remedial safety measures for fear of incriminating one's self (*see Hagan v. Washington Suburban Sanitary Comm'n*, 20 Md.App. 192, 314 A.2d 699 (1974)), is clearly irrelevant to prior policies.

Appellant, however, argues that *Stein v. Overlook Joint Venture*, 246 Md. 75, 227 A.2d 226 (1967), supports her claim that the prior policy of the Center was admissible. In *Stein*, the plaintiff, a young child, was injured when she walked through a glass panel in her apartment building, thinking it was an open area. Testimony at trial established that there had been six or seven similar accidents, that those accidents had been reported to the resident manager, and that a maintenance engineer at the apartment complex had suggested that decals or bars be placed on the windows. Evidence also showed that all the panels had decals at one time, but that when the glass was broken, no decals were placed on the replacement panels. The Court

of Appeals held that the judge erred when he directed a verdict in favor of the defendant. The court explained:

Not only was there evidence that the defendant had knowledge and therefore notice of the dangerous characteristics of the clear glass panels, but there was also evidence of the failure of the defendant to replace the decals on the panels that had theretofore been accidentally broken from which an inference of negligence could be inferred. Evidence of prior accidents is admissible, not only to show notice, but as bearing on the dangerous nature of the apparatus involved in the current accident. *Locke, Inc. v. Sonnenleiter*, [208 Md. 443, 118 A.2d 509 (1955)]; *Cordish v. Bloom*, 138 Md. 81, 113 Atl. 578 (1921). And a question as to whether an owner had knowledge or notice of the defective and dangerous conditions of its premises is generally for the jury to decide. *Rawls v. Hochschild, Kohn & Co.*, 207 Md. 113, 113 A.2d 405 (1955); *Grzboski v. Bernheimer–Leader Stores*, 156 Md. 146, 143 Atl. 706 (1928).

*Id.* at 81–82, 227 A.2d 226.

We do not interpret *Stein* as broadly as appellant suggests. Although the court in *Stein* noted that one could infer negligence from the failure to replace the decals after the panels were broken, the court also noted that the defendant had knowledge or notice of the danger the unadorned panels posed. There also was evidence at trial that the defendant had been informed that decals would alleviate the danger and yet the defendant failed to replace the decals on the panels.

In the case at bar, there was no evidence of prior accidents when the patients were left at the Health Department. Furthermore, other than the fact that the pre–1981 policy was to have a staff member remain with the patients until they completed their appointments, there was no evidence to suggest that officials at the Center believed that the patients were in any danger. Given these factual differences, *Stein* is not controlling. This, however, does not necessarily mean the evidence is inadmissible.

Absent some rule against its admission, the evidence of prior policies would be admissible as long as it was relevant, competent and material. As noted by Dean Wigmore: "[O]ur law of evidence rests [on] this: All facts having rational probative value are admissible unless some specific rule forbids." 1 J. Wigmore, *Evidence* § 10 at 667 (Tillers rev. 1983) (footnote omitted). *See also Haile v. Dinnis*, 184 Md. 144, 152, 40 A.2d 363 (1944) (citing Wigmore). Thus, the admissibility of the evidence of the Center's prior policies for the transportation of patients to and from the Health Department turns on whether the evidence was probative of the defendant's negligence.

The trial judge concluded that the prior procedure was not probative. In rejecting the evidence, Judge Corderman stated: "I just don't think that any prior practice [1½ years before the accident] has any relevance to an accident that happened in 1982...." The determination of whether evidence offered by a party is relevant is generally left to the discretion of the trial judge. *See Schear v. Motel Management Corp.*, 61 Md.App. 670, 682, 487 A.2d 1240 (1985), citing *Haile v. Dinnis*, 184 Md. 144, 40 A.2d 363. Thus, the issue for this court on appeal is whether the trial judge abused that discretion.

Under the facts of the case at bar, we hold that the judge did abuse his discretion when he refused to admit the evidence. Although we express no opinion as to whether, standing alone, the evidence of the Center's prior policy for the transportation of patients to and from the Health Department would be relevant, inasmuch as we have also concluded that the Center's subsequent policy is admissible, the prior policy takes on much more importance as part of a pattern that evidences the hospital's perception of its duty to its patients.

## II.

Appellant also contends that her motion for a mistrial on the ground of juror bias was erroneously denied by Judge

Corderman.[5] Although we cannot say at this point whether a mistrial was warranted, the failure of the trial judge to inquire into a serious allegation of juror bias compels us to remand this case for a new trial.

The motion arose under the following circumstances. After the jurors were impaneled and sworn and the trial had begun, counsel for appellant moved for a mistrial. Counsel proffered that the plaintiff/appellant had overheard a conversation in the hallway before the jury was impaneled, during which a person who was ultimately chosen to be a juror made a reference to the so-called insurance crisis. That juror allegedly said that "these cases are costing too much money" and a stop should be put to it.

A motion for a mistrial because of alleged jury misconduct will be granted only if "the misconduct [was] such as to reasonably indicate that a fair and impartial trial could not be had under the circumstances." *Sun Cab Co. v. Walston,* 15 Md.App. 113, 158, 289 A.2d 804 (1972), *aff'd,* 267 Md. 559, 298 A.2d 391 (1973), *citing Jos. F. Hughes v. Stockhausen,* 212 Md. 559, 562-3, 129 A.2d 844 (1957). The decision as to whether a mistrial should be granted lies "within the sound discretion of the trial judge whose decision will not be reversed on appeal except for a clear abuse of discretion." *Mills v. State,* 12 Md.App. 449, 459, 279 A.2d 473, *cert. denied,* 263 Md. 717 (1971), *U.S. cert. denied,* 406 U.S. 967, 92 S.Ct. 2 & 11, 32 L.Ed.2d 666 (1972).

Judge Corderman denied appellant's motion and explained:

> Well, you have your Motion on the record, Mr. Schildt, but I am going to deny it because the Jurors have all taken their oath; and before they took their oath, all parties were asked if they had any exception to the Jury as empanelled and the Plaintiffs, as well as all Defendants, said that they had no such exceptions to the Jury as

---

**5.** Appellant points out in her brief that no alternate jurors had been seated and, consequently, a motion for withdrawal of the juror was not an option.

empanelled; so that I do not believe uncorroborated alleged statement concerning Jury verdicts generally warrants a mistrial, in face of the Jury having taken their oath to well and truly try this case and a true deliverance make according to the evidence. So the Motion will be denied.

■ Judge Corderman apparently concluded that appellant waived any objection she had to that juror by waiting too long to challenge the juror's alleged bias. Parties are required to exercise due diligence in challenging a juror for partiality, despite their right to a fair and impartial jury. *See Vaccaro v. Caple*, 33 Md.App. 413, 422, 365 A.2d 47 (1976) ("Our review of this record convinces us that the appellants did not exercise due diligence in the implementation of their right to peremptory challenges.").

■ In the case *sub judice, voir dire* was conducted, the jury was impaneled, and counsel for both sides had told the judge that they had no exception to the jury as impaneled. The jury was subsequently sworn, opening statements were made, the jury was taken on a view of the scene of the accident, and a luncheon recess was taken. Counsel for appellant first informed the judge of the juror's comments after the court recessed for lunch. Although the plaintiff/appellant first recognized the juror when he stepped into the jury box, she did not tell her attorney about the comments until they were on their way to view the scene. Her attorney told the judge of the comments just after the view was completed and a luncheon recess taken.

Although we cannot stress firmly enough the importance of promptly raising a challenge to a juror in order to avoid wasting the court's time and resources, we do not believe that appellant failed to exercise due diligence in asserting her claim that a member of the jury was biased against her. Unlike *Vaccaro*, 33 Md.App. 413, 365 A.2d 47, and the cases cited therein, appellant did not wait until an unfavorable verdict was returned against her; nor had the case proceed-

ed to a point where appellant could infer that an unfavorable verdict was likely.

■ We do believe that the better course would have been for counsel to request a *voir dire* examination of the juror to determine if the juror, in fact, had made those comments and, assuming that the comments had been made, whether he was nonetheless able to perform the duty he swore to carry out—to render a fair and impartial verdict. In *Safeway Trails, Inc. v. Smith,* 222 Md. 206, 159 A.2d 823 (1960), the Court of Appeals found it was not an abuse of discretion to deny a mistrial after evidence came to light that a juror discussed the case with an employee of one of the defendants. The Court of Appeals noted that the juror had been examined in chambers by the parties. The court held that, on the information before the trial judge, it was not an abuse of discretion to deny the motion for a mistrial. In the case at bar, however, we believe that once an allegation of patent juror bias was raised through the motion for a mistrial, the judge could not simply rely on the fact that the statements were uncorroborated. At that point *voir dire* should have been conducted to determine whether the juror was able to render a fair and impartial verdict. As Jacob Stein explained in *Trial Handbook for Maryland Lawyers:*

> It is fundamental to the right of trial by a jury that members of that body be impartial and unbiased. The purpose of examination on voir dire is to help meet this basic tenet of a jury trial by separating from the panel those prospective jurors who cannot render a fair and impartial verdict based solely upon the law and the evidence.

J. Stein, *Trial Handbook for Maryland Lawyers* § 6.6, at 103 (2d ed. 1986).

This fundamental principle is no less true once the trial has begun. The statements allegedly made by the juror indicate a strong personal bias. They evidence a belief that cases such as those brought by appellant should be prevent-

ed, regardless of their individual merit, because they supposedly cost "too much money." When such an allegation of personal juror bias was disclosed only after the juror was sworn, it was incumbent on the judge to conduct *voir dire* to determine if that juror could put aside his personal bias and render a fair and impartial verdict. Failure to do so requires us to remand this case for a new trial.

JUDGMENTS REVERSED AND CASE REMANDED FOR A NEW TRIAL; COSTS TO BE PAID BY APPELLEES.