SAFEWAY TRAILS, INC. ET AL. *v.* SMITH ET AL.

[No. 184, September Term, 1959.]

208

*Decided April 8, 1960.*

*Motion for modification of opinion filed May 6, 1960, granted May 10, 1960, and opinion modified.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Jeffrey B. Smith* and *M. King Hill, Jr.,* with whom were *Smith, Somerville & Case* on the brief, for appellants.

*Paul Berman,* with whom were *Sigmund Levin, Stanley Paul,* and *Theodore B. Berman* on the brief for Calvin B. Smith, appellee.

*Paul F. Due,* with whom were *Due, Nickerson, Whiteford & Taylor* on the brief, for Arthur A. Gallagher, et al., appellees.

*Foster H. Fanseen* for Wayne C. Wood, appellee.

HAMMOND, J., delivered the opinion of the Court.

This appeal is by two intercity bus companies and their driver from a very large judgment in favor of a paying passenger who was seriously hurt when a bus sideswiped a heavy trailer.

The bus was owned by Trailways of New England, Inc., and was being utilized at the time by Safeway Trails, Inc. Calvin Smith, the injured plaintiff, boarded the bus one June night of 1957 in Baltimore to go to Philadelphia to visit his sister. About half a mile beyond the Susquehanna River bridge, on Route 40 while the bus was in the fast lane passing an automobile, its left side was ripped open, in the words of its driver, Neff, "like a can opener on a can" by the rear right corner of a heavy flatbed trailer which was projecting into the fast lane at a cross-over. Neff testified he did not see the silhouette of the trailer until he was sixty-five feet away; he had told the police he had not seen it at all as he approached.

At the point of the accident Route 40 is a dual lane highway with two twelve-foot lanes on each side, separated by a thirty-seven foot grass median strip. There are macadam shoulders about eleven feet wide on each side. The tractor-trailer, which weighed twenty thousand pounds, was loaded with forty thousand pounds of steel covered by a dark tarpaulin. It was travelling towards Philadelphia ahead of the bus and had turned left into the crossway in order to drive to a garage on the other side to stop for the night. Traffic in the fast lane of the Baltimore bound side of the road made the tractor stop at the edge of that lane for a minute or two. Because the overall length of the tractor-trailer was forty-four feet, all of it would not go into the thirty-seven foot long crossway even though the driver "jack-knifed" the rig, and the right rear corner of the trailer projected at an angle into the fast lane of the Philadelphia-bound side of Route 40 about a foot and a half. The tractor-trailer was equipped with some twenty lights, including red rectangular clearance lights on both the left and right rear corners, which delineated its outlines. It also bore seven red reflectors. All the lights were lighted at the time of the accident.

The jury exonerated the owner and driver of the tractor-trailer and Wood, the driver of the car which the bus was passing at the time of the accident. No one questions the correctness of the jury's action as to Wood.

The appellants claim error in the failure of the trial court to instruct the jury as they requested: (a) as to the boulevard law; (b) that, as a matter of law, their verdict should be for the plaintiff against the owner and driver of the tractor-trailer; and (c) that there was no evidence of excessive speed. A second main contention is that a verdict should have been directed in favor of Trailways of New England, Inc. Appellants strongly contend also that there was reversible error in refusing to declare a mistrial because of the cumulative effect of misconduct of a juror and an improper and inflammatory argument to the jury, and particularly to the juror in question, by counsel for the plaintiff. Finally, they urged that the trial court's "erroneous consideration of the facts and law in denying defendants' motion for a judgment n. o. v. or a new trial amounted in reality to a failure to exercise sound discretion and the case should be remanded for a new trial."

The bus companies excepted to the charge of the trial judge because the jury was not told that Route 40 is a boulevard and because the charge did not contain requested instructions that (a) "The favored driver on the boulevard has nearly an absolute right-of-way over other vehicles and this dispenses with calculations of speed, time and distance;" (b) "A driver on the boulevard is not required to slow down at intersections;" and (c) "The primary, obvious and essential purpose of a boulevard is to accelerate the flow of traffic." We find no error. At the end of the case the parties stipulated that Route 40 was a boulevard. The requested instructions were abstractions not related to the facts of the case. We think the boulevard law does not apply, but if it be assumed that it does, the instructions sought were too broadly stated. "It is true that the driver on a boulevard is not obliged to anticipate that someone will negligently come into his path, but he is not excused from liability to his passengers if someone does come in, and he fails to avoid a collision because he

did not look in time to see what was inevitable." *Sun Cab Co., Inc. v. Hall,* 199 Md. 461, 467. In the same case it was also said, in speaking of earlier boulevard cases: "Neither of these cases holds that a driver on a favored highway can proceed without regard to the possibility of some other driver usurping his right of way." In *Fowler v. DeFontes,* 211 Md. 568, 574, we said: "Of course, although the favored driver has the right to assume that the unfavored driver will yield the right of way to him, that does not mean that the traveler on the favored highway has an absolute, unqualified, and complete right of way at all times and under all circumstances. This right of way is to be enjoyed with due regard to the circumstances then and there existing."

The boulevard law was not applicable here for several reasons. The tractor-trailer was not entering a through highway, it was leaving one. The proposition that a following motorist on a boulevard has the right either to assume that a vehicle ahead will uninterruptedly complete a left turn off the favored road, or to ignore the possibility that it will for some other reason temporarily block the highway, is new to us and we have not been referred to or found authority supporting it. By its express terms, the boulevard law controls entrance onto the favored highway; exit from it is not mentioned. Code (1957), Art. 66½, Sec. 2 (60) and Secs. 233 and 242.

The error claimed in the refusal to direct a verdict against the owner and driver of the tractor-trailer is that its violation of the boulevard law was the proximate cause of the accident. The contention is disposed of by our holding that the boulevard law was not applicable. Maryland permits a tractor-trailer as long as that involved to use the highways and it allows the left turn from the boulevard which was made. The driver of the tractor-trailer executed the only feasible and practicable maneuver available in making a lawful turn and his blinking turn lights and the other warning lights and reflectors warned drivers following that the crossing was too short by a foot and a half to contain all of the trailer. The question of the negligence of the tractor-trailer was for the jury.

On the question of speed a State trooper testified that the tachograph taken from the bus showed it was traveling at fifty-six miles an hour—a mile above the limit—and then said that a more detailed study made later showed the true and accurate figure shown to have been forty-six miles an hour. Plaintiff's counsel attempted, by cross-examination of the bus driver, to establish that the failure of the bus to stop after the accident until it had gone four hundred feet was evidence of excessive speed. After appellants had excepted to the court telling the jury they could decide whether the speed was under or over the limit, the trial judge supplemented the charge by advising the jury that "the expert advice or testimony * * * [as] to the probable speed of the bus as determined from the tachograph would indicate a speed at the time of impact of forty-six miles per hour and not fifty-six miles per hour speed. I just want to make it perfectly clear that I was not suggesting to you that you should consider the speed as fifty-six miles per hour but the indication is that the actual speed was around forty-six miles per hour * * *." If there was error in the original charge, it was cured by the supplemental instructions.

The evidence that Neff was not the agent of Trailways of New England, Inc., was neither uncontroverted nor conclusive, and the motion for a directed verdict in favor of that corporation properly was rejected. Trailways concedes the established rule that ownership of the bus gave rise to a presumption that the driver was its agent. When Safeway denied ownership of the bus by special plea, the plaintiff traversed it and sought by interrogatories to discover who owned and was operating the bus when the accident happened. Interrogatory thirteen asked the names and addresses of all corporations and persons "who, on June 25, 1957, owned or had any interest in *or any right to possession of the motor bus* being operated by the individual defendant, Robert A. Neff, at the time of the collisions * * *." (Emphasis supplied.) It further asked (as to each such corporation or individual) "(a) * * * in detail the nature and extent of the ownership, interest or right of each in the motor bus on said date;" "(b) If the name Safeway Trails, Inc., or a name similar thereto, is furnished in response to this interrogatory,

state, in detail, the relationship, if any, that existed between that company and the corporate defendant, Trailways of New England, Inc., on June 25, 1957, including particularly but not exclusively the nature and extent of the ownership of the motor bus mentioned in the declaration;" and "(c) State fully the facts on which the corporate defendant, Safeway Trails, Inc., relies in its denial, contained in its first plea to the declaration, of ownership of the motor bus involved in the collisions."

The answers to these inquiries were: "Now come Safeway Trails, Inc., Trailways of New England, Inc., and Robert A. Neff by * * * their attorneys, and for answers to the interrogatories heretofore propounded by the plaintiff, state: * * * 13. Trailways of New England. a. b. c. Said corporation was the sole owner of the motor bus."

The interrogatories were signed and sworn to for Safeway and Trailways separately by the same individual, Marvin E. Walsh, as vice president of each of the corporations. The interrogatories and answers were offered and admitted in evidence, and, under Maryland Rules 417 (f) and 413 (a) (2), as the answers of the adverse party, became substantive evidence—sworn, although not conclusive, admissions of fact. *Ridley v. Young* (Col.), 253 P. 2d 433.

It was shown also that the ticket Smith bought bore the names Safeway and Trailways (the latter claimed by the appellants to refer to National Trailways Bus System, a nonprofit system of separate corporations operating under the Trailways name to furnish through bus service over each other's franchises) ; that when Neff was first employed it was as a result of his application and visit to "Trailways;" and that the bus bore on its side the legend "owned and operated by Trailways of New England, Inc."

Appellants produced offsetting testimony by the claim agent of Safeway that Trailways of New England was not operating in Maryland or elsewhere in June 1957, because its operators were on strike. He said there was a written agreement in effect between the two corporations and produced an

unsigned paper dated 1951, which referred to supplements which would seem to have been material and pertinent on various points of importance but which were not produced. The writing provided that the companies would lease busses to each other for a flat sum per mile, that the compensation of the driver be paid by the company operating the bus, that the driver shall be competent and that the operating company be solely responsible for the operations of the bus.

We think the question of the relationship between Trailways of New England and the bus was for the jury. In the interrogatory, Safeway and Trailways swore that the latter had sole right of possession at the time of the accident. Concededly there was no unauthorized use of the bus. The admission could be fairly construed as a statement that Trailways was operating the bus when Smith was injured. We held in *Campbell v. Dix*, 203 Md. 338, 344-345, that if an inconsistency appears between statements in a pre-trial deposition and testimony at the trial, the weight and credibility of the testimony are for the jury.

The inter-relation of the two companies in the matter, which the evidence would permit the jury to find, is somewhat like that in *Pennsylvania Railroad Co. v. Lord*, 159 Md. 518, 535, where the offending truck was owned by the defendant, the Pennsylvania Railroad Co., and was leased to another railroad corporation and operated by an employee of a third. This Court saw evidence from which the jury might have found—including the fact that some of the officers of the three corporations were the same—that the lessee and the operating company were "parts of the Pennsylvania Railroad system, were under the direct management and control of the officers of that railroad, and were its agents."

We have consistently held that if the evidence to rebut the presumption of agency from ownership is contraverted and is not conclusive, the jury must decide the issue. *Fowser Fast Freight v. Simmont*, 196 Md. 584, 588; *Scott v. James Gibbons Co.*, 192 Md. 319, 324; *Taylor v. Wesley Freeman, Inc.*, 186 Md. 474. It was pointed out in *Grier v. Rosenberg*, 213 Md. 248, 255, that whether the evidence in rebuttal of the

presumption is so slight that it is insufficient for the considera-
tion of the jury or so conclusive as to require a directed ver-
dict for the defendant "must depend upon, and be decided
by, the facts developed in each individual case." Here we
think the facts were for the jury.

The matter of the misconduct of the juror and that claimed
of counsel for the plaintiff in connection therewith, came about
in this fashion. Juror Number Twelve, named Cross, made
daily visits to the bus depot of Safeway in Baltimore in the
course of his work for a printing company. A Safeway dis-
patcher named Stringfellow and the juror had been friendly
for a year and a half. On the evening of the second day of
the trial, the juror came into the bus terminal and, in re-
sponse to Stringfellow's question as to why he was not in
work clothes, said that he was serving on the jury in a case
involving Trailways. Stringfellow replied that he had heard
of the case; it was the one where steel had rammed into the
side of the bus and cut some people's legs off. The juror
then remarked that the plaintiff was asking for $300,000 and
that the jury had not yet decided which of the defendants was
at fault or whether, whatever was decided, they would award
the full amount claimed although he, the juror, thought it
would be less. Counsel for appellants, having learned of the
incident on the morning of the seventh day of the trial, in-
formed the trial judge at his home that night.

The next morning Stringfellow's testimony was taken out
of the presence of the jury and a conference was held in cham-
bers. All counsel appear to have been inclined to the view
that because of possible prejudice to the plaintiff, as well as
to the owner and driver of the tractor-trailer and to Wood,
the juror should be excused and the case decided by eleven
jurors. It is apparent that at the time there was no doubt
in anyone's mind that there would be a large verdict. In this
setting counsel for Safeway and Trailways said to the Court
that "counsel agree if we go ahead the court can control the
verdict in the sense he can always reduce it but, in our discus-
sion, Your Honor, I think, indicated there is some doubt as
to whether you would cut a verdict," to which the court re-
plied in substance that, in a case of this type, where he an-

ticipated that the verdict would be based mainly on pain and suffering, plus the loss of a leg, he would be very hesitant to substitute his judgment for that of the jury.

Whereupon counsel for appellants said they would insist on twelve jurors and made a motion for a mistrial, which was denied. All counsel except those representing appellants agreed to go ahead with the offending juror on the jury, and the court said : "I am going to deny the motion for the reason that all other counsel have expressed a willingness to proceed with this Juror on the panel, and in my opinion his presence on the panel is much more damaging to them, or likely to be much more damaging to their interest than to yours."

The jury did not know of the incident and it was arranged that they would not see Stringfellow.

Although the juror should not have engaged in conversation with anyone about the trial, the conversation appears to have been innocuous enough and without indication of prejudice either to appellants or the fair consideration of the case. In his opening statement plaintiff's counsel, without objection, had told the jury his client's claim was in the amount of $300,000. The testimony had revealed that steel had "rammed" the bus causing so many serious and bloody injuries that the local hospitals could not hold the victims. The juror's remarks showed an open mind as to liability and damages. Indeed the appellants, although urging that the combination of the juror's conversation and the argument of counsel was prejudicial, concede that "the original conversation between the juror and the dispatcher may have been innocent enough."

The significant and controlling thing is not that the juror violated the instructions of the court and was guilty of an impropriety but, rather, whether the conversations were "of such a nature that their effect must fairly be held to have been to deprive the injured party of a fair and impartial trial." *Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co.*, 163 Md. 401, 408. The rule followed in that case was that "not every trivial act on the part of a juror * * * amounts to such misconduct as requires the withdrawal of a juror" and the Court held: "The better rule in such cases would seem to be that such questions be left to the sound discretion of the trial court,

whose decision should only be disturbed in those cases where there has been a plain abuse of discretion, resulting in palpable injustice." The case is annotated in 86 A.L.R. 922 with subsequent annotations in 52 A.L.R. 2d 182, 62 A.L.R. 2d 298, and 64 A.L.R. 2d 158. The cases elsewhere are generally in accord, as was noted by Judge Henderson for the Court in *Joseph F. Hughes & Co. v. Stockhausen*, 212 Md. 559, which followed *Rent-A-Car Co.* in finding no abuse of discretion in the refusal to declare a mistrial because of a juror's conversation about the case.

In the case before us we find no plain abuse of discretion and no palpable injustice.

Before final arguments counsel had agreed with the court that the juror-Stringfellow conversation would be kept from the jury and, also, that if any lawyer made reference to it, an objection would not have to be then made because the making, of itself, might apprise the jury of the matter. The plaintiff's lawyer concluded his argument by reminding the jury of their oaths on *voir dire* that they would not let acquaintance with the defendants affect their verdict and their oaths as jurors to "well and truly try the issues between the parties and a true verdict give according to the evidence," and went on to say: "It is a sacred sanction and a controlling force; it rises above all prejudice, passion and personal bias * * *. In the presence of this majestic oath, resting upon your conscience you should render a true verdict and not * * *." At this point counsel for appellants interrupted the argument to ask leave to approach the Bench, and, when he was denied, noted an objection.

Plaintiff's lawyer then concluded: "You are to render a true verdict in accordance with the evidence, you are to be merciful as well as just * * *. [J]udge him as you yourself would like to be judged and we will be satisfied with your verdict," and the jury retired.

Appellants then moved for a mistrial on the ground that plaintiff's lawyer had addressed himself to Juror Number Twelve, emphasizing the word "you" when he said, as paraphrased by appellants: "You have had business or contacts with one or more of the parties in this case; you must not

under your oath allow that to influence your verdict," and because "later on in his argument * * * he pointed his finger squarely at Mr. Cross and told him under his oath he was obligated to decide this case fairly and squarely." Appellants' counsel added: "He also in the course of his argument referred repeatedly to circumstances of that kind, looked at and pointed squarely at Mr. Cross in the course of addressing his remarks * * *. We think that one of two things would result from that, either Juror Number 12 is now intimidated or it could be he now knows of this incident and would necessarily be prejudiced against the party who disclosed the information to the Court, which quite definitely is Safeway Trails and the other interests we represent." Plaintiff's counsel immediately denied flatly that he had addressed Cross directly and said he had looked at all the jurors when he used the word "you." "I talked to them collectively. I did talk so Mr. Cross and the rest would understand if they had any business dealings with them that it was not to influence them at all. I do not think I went out of the way when I reminded them of their oath, and that is all I did, and they must decide the case on the evidence without fear or favor, and without sympathy, without prejudice, without passion, without bias. I certainly have a right to do that."

The trial court said: "I was watching and listening attentively to all of the arguments. I was sorry Mr. Smith got up and asked to approach the Bench at that time, frankly, because I think it did as much or more to suggest that there may have been some relationship between Number Twelve Juror and the Bus Company than anything else. I thought it better at that time to do what I did rather than interfere with argument and have a conference at the Bench.

"Gentlemen, under all of the circumstances I can understand the concern of counsel in the case under the circumstances as they have developed but I do not believe that there is anything that happened during the course of argument that would at this stage of the proceedings justify me in declaring a mistrial, so the motion is denied."

We cannot say that the trial judge who heard and saw what happened abused discretion in denying a mistrial. Appellants'

fears that Juror Number Twelve had been intimidated or made resentful against appellants would not seem to rise above speculation. Because appellants would not proceed with eleven jurors, plaintiff's claim was in the hands of a jury of which one member could be suspected of being sympathetic to the appellants, if he leaned in either direction. Plaintiff did nothing improper in reminding the jury as a whole of their oaths as to impartiality and a decision on the evidence. The trial judge found against appellants on their claim that plaintiff's lawyer did this improperly, that he singled out Juror Number Twelve. The record offers no basis for finding the trial judge to have been wrong in this finding.

Appellants go beyond the juror incident to contend further that the argument of counsel for the plaintiff, in general, was intended to inflame the passions and prejudices of the jury, and did so to the point of reversible error. We think the argument is to be rejected for two reasons, on the merits and because there was no request for a ruling or rulings as to any argument now complained of. Counsel for Safeway and Trailways throughout the trial and in argument attempted to depict the claimant as a human derelict, riddled with previous ill health, an alcoholic with no earning capacity and a person generally unworthy of the award a more responsible and prepossessing citizen would be apt to receive. They sought to create the impression that the years of long confinement in various casts, his many operations and the dismal prognosis for the indefinite future were the result of incompetent medical care. They attempted to implant in the minds of the jury that as a veteran he could hereafter receive free and competent care in veterans' hospitals at government expense. The claimant in rebuttal sought to show that the bus companies were callous and had attempted to evade responsibility, that the defendants' own doctors had substantiated the extent of the injuries and approved the treatment given, and that the claimant had suffered and would suffer intensely and was entitled to as much as any one else for his suffering and was also entitled to the full cost of past and future medical care. The arguments of counsel for the plaintiff were vigorous and at times perhaps reached the outer edge of propriety. At such

times they seem to have been induced by, and to have been in reply to, arguments of counsel for the bus companies. Plaintiff's challenged arguments were confined to comments upon the evidence or replies to the opposition and were not such as to require the trial court or this Court to act *sua sponte*. Compare *Apple v. State,* 190 Md. 661, 667, where the Court found the claim of improper argument by the state's attorney was not before it for review because there had been no ruling below, and said of *sua sponte* review: "It is, of course, true that in a criminal case where grave error has been committed, and the accused is thereby denied due process, an appellate court may and should, on its own motion, reverse the conviction." In the civil case before us, there was neither grave error nor lack of due process. See *Wolfe v. State, for Use of Brown,* 173 Md. 103, 118-119; *Glickman v. State,* 190 Md. 516, 521; *Middendorf, Williams & Co. v. Milburn Co.,* 137 Md. 583, *Esterline v. State,* 105 Md. 629; *Citizens' Mutual Fire Insurance Co. of Cecil County v. Conowingo Bridge Co.,* 116 Md. 422; *Trombero v. McWilliams,* 221 Md. 399.

Appellants interrupted the argument of plaintiff's counsel four times in addition to the incident involving Juror Number Twelve which has been discussed. The first of the four interruptions was when a suggestion of dishonesty was made in connection with an answer of appellants to an interrogatory that the Wood car had forced the bus into the tractor-trailer, the plaintiff claiming that the bus companies knew this was not so, when they made it, from the testimony at the traffic court and because the driver Neff had never so claimed and did not so claim at the trial, and because they had not shown surprise and had never made explanation when there was no support in the testimony for such a claim. The court said to the jury he did not think there was dishonesty, and appellants' counsel seemingly were satisfied and acquiesced.

The second interruption was when plaintiff's counsel requested the trial court's permission to use the blackboard to write down the eight elements he thought the jury should consider in determining damages. Upon objection, the blackboard was not used, and no ruling or request for a ruling was made.

The third interruption was there was objection to a statement by plaintiff's counsel as to the cost of about five thousand dollars for a private doctor and a private room, coupled with a reference to pain and suffering. The ground of the objection was that the plaintiff's counsel was testifying by giving his opinion; whereupon, plaintiff's counsel requested that the remarks be stricken from the record and that the jury ignore them. There was no ruling and no insistence on a ruling.

The fourth interruption was to object to the argument that the bus companies were evading their responsibility and that they had not given the plaintiff medical care. Appellants' counsel said that their clients had no responsibility to supply medical care. Plaintiff's counsel told the trial court he had not meant to refer to medical care and the court observed he thought that he had, but that he had explained it now and that ought to satisfy everybody. Appellants made no request for a ruling and none was made.

The record discloses no other requests for rulings or for a mistrial, in connection with the argument or otherwise, except those we have discussed. That there is nothing more for this Court to review under the circumstances seems to be established by *Wilhelm v. Hadley*, 218 Md. 152, 159; *Brawner v. Hooper*, 151 Md. 579; *Lynch v. Mayor, etc., of Baltimore*, 169 Md. 623. See also *Lusby v. State*, 217 Md. 191, 195-197; *Martin G. Imbach, Inc. v. Tate*, 203 Md. 348, 360; *Luray v. State*, 157 Md. 635, 638; *Neusbaum v. State*, 156 Md. 149 and *Annapolis Gas, etc., Co. v. Fredericks*, 112 Md. 449, 458. Compare *Nelson v. Seiler*, 154 Md. 63; and *Pugaczewska v. Maszko*, 163 Md. 355, where there were requests for rulings and rulings were made.

Recognizing that this Court has almost unvaryingly left the granting or denying of a new trial to the sound discretion of the trial court, the appellants, in their final contention, urge that there was an abuse of discretion in the denying of their motion for a new trial in that the court's consideration of the motion in reality amounted to a failure to exercise discretion at all, as in *Washington, Baltimore and Annapolis Electric Railroad Co. v. Kimmey*, 141 Md. 243, where the trial court refused to consider evidence offered by the applicant in sup-

port of his motion and so, in effect, refused even to entertain the motion. Judge Carter filed an opinion which covered some seventeen pages of the record extract, in which he gave careful and extended consideration to most, if not all, of the matters which we have discussed and to the extent of the plaintiff's injuries and the size of the verdict. Appellants' real complaint is as to the result of the trial court's consideration. Although we find no ground for relief for appellants in this contention, which essentially is that the trial court would not order a remittitur or a new trial, we deem it appropriate to reiterate what we said recently in *Turner v. Washington Suburban Sanitary Commission,* 221 Md. 494, 158 A. 2d 125, that the practice of ordering a remittitur "is as much an incident and corrective of jury trial as the right of a trial court to set aside a verdict on the ground that it is against the evidence, or against the weight of the evidence."

It was for the trial judge to determine whether the verdict shocked his conscience. He determined it did not. We think apposite the language of the Court in *Brawner v. Hooper, supra,* at page 594 of 151 Md. (where a remittitur was ordered and made), in which the atmosphere of the trial would seem to have been like that in this case and some of the same contentions were made on appeal. It was there said, in speaking of the refusal of the trial judge to strike the judgment: "Nor in dealing with the motion could we consider the fact, if it were properly before us, that the verdict was excessive. That, together with the supposed conduct of court and counsel of which appellant complains, were matters proper for the consideration of the trial court on a motion for a new trial, but this court will no more review the action of the trial court in dealing with such facts in connection with such a motion as that before us, than we would review its action in dealing with a motion for a new trial."

*Judgments affirmed, with costs.*